**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

RECEIVED

MAR 06 2013

AT 8:30_____M
WILLIAM T. WALSH
CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, THE STATE OF ALABAMA, THE STATE OF ALASKA, THE STATE OF ARIZONA, THE STATE OF ARKANSAS, THE STATE OF CALIFORNIA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF FLORIDA, THE STATE OF GEORGIA, THE STATE OF HAWAII, THE STATE OF IDAHO, THE STATE OF ILLINOIS, THE STATE OF INDIANA, THE STATE OF IOWA, THE STATE OF KANSAS, THE COMMONWEALTH OF KENTUCKY, THE STATE OF LOUISIANA, THE STATE OF MAINE, THE STATE OF MARYLAND, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF MICHIGAN, THE STATE OF MINNESOTA, THE STATE OF MISSISSIPPI, THE STATE OF MISSOURI, THE STATE OF MONTANA, THE STATE OF NEBRASKA, THE STATE OF NEVADA, THE STATE OF NEW HAMPSHIRE, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF NORTH DAKOTA, THE STATE OF OHIO, THE STATE OF OREGON, THE COMMONWEALTH OF PENNSYLVANIA, THE STATE OF RHODE ISLAND, THE STATE OF SOUTH CAROLINA, THE STATE OF SOUTH DAKOTA, THE STATE OF TENNESSEE, THE STATE OF TEXAS, THE STATE OF UTAH, THE STATE OF VERMONT, THE COMMONWEALTH OF VIRGINIA, THE STATE OF WASHINGTON, THE STATE OF WEST VIRGINIA, THE STATE OF WISCONSIN, THE STATE OF WYOMING, THE DISTRICT OF COLUMBIA, and ex rel, CLARENCE E. OWENS, appearing QUI TAM, | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : | FILED UNDER SEAL<br><br>13-1373 JNR/KMW<br><br>TRIAL JURY DEMANDED |
| Plaintiff, | : | |

1

v.

GOLDMAN SACHS GROUP, INC.,                              :
WELLS FARGO & COMPANY                                   :
WELLS FARGO BANK, N.A.,                                 :
DEUTSCHE BANK AG                                        :
DEUTSCHE BANK NATIONAL TRUST COMPANY,  :
BANK OF AMERICA CORPORATION                        :
BANK OF AMERICA, N.A.,                                 :
BAC HOME LOANS SERVICING, LP                       :
RECON TRUST                                                   :
J.P. MORGAN CHASE & COMPANY                        :
JP MORGAN CHASE, N.A.                                     :
RESIDENTIAL CAPITAL, LLC,                             :
CITIGROUP INC., CITIBANK, N.A.,                       :
CITIMORTGAGE, INC.,                                       :
CREDIT SUISSE GROUP AG,                                :
ALLY FINANCIAL INC.,                                      :
GMAC MORTGAGE, LLC,                                    :
GMAC RESIDENTIAL FUNDING CO. LLC             :
U.S. BANCORP and U.S. BANK, N.A.                     :
HSBC HOLDINGS PLC                                          :
EVERBANK                                                        :
SOVERIGN BANK                                               :
MERSCORP HOLDING INC., and MORTGAGE       :
ELECTRONIC REGISTRATION SYSTEM, INC.,       :
GREEN TREE SERVICING, LLC                           :
AURORA BANK and AURORA LOAN                    :
SERVICES,LLC                                                    :
SELECT PORTFOLIO SERVICING,                        :
NATIONSTAR MORTGAGE HOLDINGS INC. and  :
NATION STAR MORTGAGE LLC                          :
OCWEN FINANCIAL CORPORATION,                    :
OCWEN LOAN SERVICING LLC,                          :
LITTON LOAN SERVICING LP,                            :
PHH CORPORATION and PHH MORTGAGE          :
PHELAN HALLINAN & SCHMIEG, PC,                  :
PHELAN HALLINAN & SCHMIEG, LLP,               :

                              Defendants,                               :
_____

2

## I.   **COMPLAINT**

1. Relator Clarence E. Owens, brings this qui tam action, and related causes of action, on behalf of the United States of America, the 50 States within the Union, and the District of Columbia, against Defendants Goldman Sachs Group, Inc., Goldman, Sachs & Co., Inc., GS Mortgage Securities Corp., Goldman Sachs Mortgage Company, Wells Fargo & Company, Wells Fargo Bank, N.A., Deutsche Bank AG, Deutsche Bank National Trust Company, Credit Suisse, Bank of America Corporation, Bank of America, N.A., BAC Home Loans Servicing, LP, Recon Trust, BANA LAS HFI, Citigroup Inc., Citibank, N.A., CitiMortgage, Inc., J.P. Morgan Chase & Company, J.P. Morgan Chase, N.A., U.S. Bancorp, U.S. Bank, N.A., Ally Financial, GMAC Mortgage, LLC, Residential Capital, LLC, GMAC Residential Funding Co. LLC, Core Logic Inc., HSBC, EverBank, Sovereign Bank, MERSCORP Holding Inc., Mortgage Electronic Registration System, Inc., Green Tree Servicing, LLC Aurora Loan Servicing, Select Portfolio Servicing, Inc., Nationstar Mortgage Holdings, Inc., Nationstar Mortgage, LLC, Ocwen Financial Corporation, Ocwen Loan Servicing, LLC, Litton Loan Servicing, LP, PHH Mortgage Company, (the aforementioned Defendants are hereby referred to as the Banks), Phelan Hallinan & Schmieg, PC, Phelan Hallinan & Schmieg, LLP (hereby referred to PHS), alleging as follows:

## II.   **INTRODUCTION**

2. This is a qui tam action under the False Claims Act ("FCA"), the Fraudulent Enforcement And Recovery Act (FERA), and pursuant to 18 U.S.C. § 1964(c), to recover treble damages and civil penalties under the aforementioned and the False Claims Act, as amended, 31 U.S.C. § § 3729 et esq, arising from fraud on the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (hereby referred to as Fannie Mae and Freddie Mac), the United States Department of Housing and Urban Development (hereby referred to as HUD), The United States Department of Veterans Affairs Loan Guaranty Service Home Loan Program (hereby referred to as the VA), the Federal Housing Administration (hereby referred to as FHA), and the Department of Agriculture's Rural Housing Service Rural Housing Guarantee Program ( hereby referred

to as RHS), as it pertains to, in part, the origination, servicing, loss mitigation, and foreclosure of residential mortgages across the United States of America.  Furthermore, the Defendants either, directly, received TARP Treasury Funds of 2008, or indirectly through AIG in March 2009.

3. As described in the allegations below, Defendants' misconduct resulted in the issuance of improper mortgages, premature and unauthorized foreclosures, violation of service members' and other homeowners' rights and protections, fraud upon the courts, corruption of U.S. public records through the use of false and deceptive affidavits and other documents, monetary losses by the U.S. Government, and the waste and abuse of taxpayer funds.  Each of the allegations regarding Defendants contained herein applies to instances in which one or more, and in some cases all, of the Defendants engaged in the conduct alleged.

4. Furthermore, these allegations, in part, triggered the Financial Crisis of 2008 followed by $700 Billion+ in TARP Funds, $1.2 Trillion in Federal Reserve Emergency Funds, the Dodd-Frank Act, the enactment of the FERA, the U.S. Government Authorities, of which includes the 50 U.S. Attorney Generals March 2012 civil complaint, and the ongoing discoveries into the Defendants' unfair and deceptive mortgage related practices, of which includes the recent discoveries by international authorities into manipulation of the London Interbank Offered Rate (hereby referred to as Libor), by several of the Defendant Banks' and their affiliates. The aforementioned violations, in part, triggered this complaint, supported by extensive audits of mortgage transactions, recorded in America's County Clerks' Offices, displaying the continuation of the allegations set forth in the 50 U.S. Attorney Generals' March 2012 civil complaint, to which several Defendants settled $25 Billion.

## III.  THE PARTIES

5. Relator Clarence E. Owens is a citizen of the United States of America and resides in the State of New Jersey, and pursuant to the aforementioned statues, brings this action on behalf of the United States of America, each State within the Union, and the District of Columbia.  Relator is an economist and pre law school candidate by his education at

Howard University in Washington, D.C. (Hampton University 1997-1998, Howard University 1998-2001), from 2006 to Present, Relator was employed as licensed New Jersey realtor, helping U.S. citizens purchase homes that were, in part, financed, serviced, and / or foreclosed by the Defendant Bank' and their affiliates, and performed REO services for at least 1 of the Defendant Banks' and their affiliates, in his capacity as a licensed New Jersey realtor, and as the owner of a maintenance company.  Furthermore, in January 2013, the Relator filed 9 whistle blower reports with the SEC regarding Exchange Act violations by several of the Defendants operating REMICs.[1]  Since, the Relator has identified hundreds of REMICs in violation of the Exchange Act, of which is in part subject to this qui tam action.

## DEFENDANTS

6.  Defendant Goldman Sachs Group Inc., is an American multinational investment banking firm that engages in global investment banking, securities, investment management, and other financial services primarily with institutional clients. Parent company Goldman is headed by CEO Lloyd Craig Blankfein (May 2006 – Present) and President / COO Gary D. Cohn (June 2006 – Present).  The firm is headquartered at 200 West Street in the Lower Manhattan area of New York City, with additional offices in international financial centers.  Goldman was a provider of lines of credit to New Century Mortgage for loan originations made by the firm throughout the U.S.A.  Defendant is a joint employers and/or joint tortfeasor.


7.  Defendant Wells Fargo & Company is parent company of Wells Fargo Bank, N.A.  Wells Fargo & Company is an American multinational diversified financial services company with operations around the world. Wells Fargo is the fourth largest bank in the U.S. by assets and the largest bank by market capitalization. Wells Fargo is the second largest bank in deposits, home mortgage servicing, and debit cards. In 2011, Wells Fargo was the 23rd largest company in the United States.  Wells Fargo Bank, N.A. originates and services residential mortgages through its division Wells Fargo Home Mortgage or its

---

[1] See EXHIBIT – JAN 2013 SEC WHISTLEBLOWER CONFIRMATION

trade name America's Servicing Company. John G. Stumpf is the Chairman, President, and CEO. The firm is headquartered in San Francisco, California, but has major hub-quarters in other cities throughout the country. Defendant Wells Fargo Bank, N.A. is a national banking association chartered in Sioux Falls, South Dakota, with principal offices at 420 Montgomery Street, San Francisco, California 94163. They maintain principal places of business at 7000 Vista Dr., West Des Moines, Iowa 50266-93 and 3476 Stateview Boulevard, Fort Mill, South Carolina 29715. Defendant is a joint employers and/or joint tortfeasor.

8. Defendant Deutsche Bank AG, parent company of Deutsche Bank National Trust Company, (hereby referred to as Deutsche) is a German global banking and financial services company with its headquarters in the Deutsche Bank Twin Towers in Frankfurt, Hesse, Germany, employing more than 100,000 people in over 70 countries, and has a large presence in Europe, the Americas, Asia-Pacific and the emerging markets. Deutsche's Chief Executive Officer and Chairman of the Group Executive Committee is Josef Ackermann since May 2002. He agreed at the end of 2009 to continue as chief executive for another three years until 2013. On 26 July 2011, along with its second quarter earnings report, Deutsche reported that Anshu Jain, head of investment banking and Juergen Fitschen, head of the German business, will replace Josef Ackermann as co-CEOs starting next year. Defendant Deutsche is located at 1761 East St. Andrew Place, Santa Ana, California 92705-4934. Defendant is a joint employers and/or joint tortfeasor.

9. Defendant MERSCORP Holdings, Inc. and its subsidiary, Mortgage Electronic Registration Systems, Inc. were founded in 1995 under a Delaware charter, and is headquartered in Reston, Virginia. MERSCORP Holdings, Inc. board of directors include Defendants JP Morgan Chase, Wells Fargo Bank, N.A., Bank of America, N.A., Ally Financial Inc., and CitiMortgage Corp. MERS shareholders include Defendants Bank of America, GMAC Residential Funding Corporation, CitiMortgage Inc., Wells Fargo Bank, N.A., Core Logic, HSBC Finance Corporation (a subsidiary of Defendant HSBC), and EverBank. MERS is a creation of the mortgage industry to allow financial

institutions to evade county recording fees, avoid the need to publicly record mortgage transfers, and facilitate the rapid sale and securitization (lack thereof) of mortgages en masse. More than 70 million mortgage loans, including millions of subprime loans, have been registered in the MERS system, rather than in local county clerks' offices. MERS is headed by Bill Beckmann in his official capacity as President and CEO of MERSCORP Holdings, Inc. and its subsidiary, Mortgage Electronic Registration Systems, Inc. Dan McLaughlin serves as Executive Vice President of MERSCORP Holdings, Inc. As it pertains to Defendant MERSCORP Holdings and MERS, the Relator seeks enforcement of United States Bankruptcy Judge Robert Grossman's ruling pursuant to 28 USC § 3202 (- Enforcement of judgments).[2] Defendant is a joint employers and/or joint tortfeasor.

10. Defendant Bank of America Corporation is the parent company of Bank of America, N.A. (hereby referred to as BANA). BANA is an American multinational banking and financial services corporation headquartered in 100 North Tryon Street Charlotte, North Carolina. It is the second-largest bank holding company in the United States by assets. Charles O. Holliday is the acting chairman (April 2010 – Present) and Brian Moynihan is the CEO (2010 - Present). Defendant Recon Trust, Headquartered in Simi Valley, CA, is a member of the Bank of America family of companies, providing an array of mortgage related services dealing with foreclosure, bankruptcy, evictions, loss mitigation, and REO related services. Defendant is a joint employers and/or joint tortfeasor.

11. Defendant Ocwen Financial Corporation is the parent company of several subsidiaries including Ocwen Loan Servicing, LLC and Litton Loan Servicing LP (Sept. 2011 – Present), licensed to service mortgage loans in all 50 states, the District of Columbia and two U.S. territories. The company is headquartered in Dunwoody, Georgia and also

---

[2] United States Bankruptcy Judge Robert Grossman has ruled that MERS's business practices are unlawful.He explicitly acknowledged that this ruling sets a precedent that has far-reaching implications for half of the mortgages in this country. United States Bankruptcy Judge Robert Grossman has ruled that MERS's business practices are unlawful. He explicitly acknowledged that this ruling sets a precedent that has far-reaching implications for half of the mortgages in this country, see http://www.huffingtonpost.com/l-randall-wray/new-yorks-us-bankruptcy-c_b_824167.html

operates in West Palm Beach, Florida. Ocwen Financial Corporation (Ocwen and its subsidiaries are hereby referred to as Ocwen) is headed by William C. Erbey (Exec. Chairman and Chairman of Exec. Committee), Ronald M. Faris (President, CEO and Director of Exec. Committee), John V. Britti (CFO and EVP), and Paul Koches (EVP, General Counsel and Secretary).   Defendant is a joint employers and/or joint tortfeasor.

12. Defendant Citigroup Inc. is a diversified global financial services company. It is a Delaware corporation headquartered in New York City. Defendant Citibank, N.A. is a national banking association. It is Citigroup Inc.'s primary U.S. subsidiary depositor institution. It is headquartered in New York City. Citibank, N.A. is a wholly owned indirect subsidiary of Citigroup, Inc. It provides residential real estate lending. Defendant CitiMortgage is a New York corporation, wholly owned indirect subsidiary of Citigroup, Inc., and is a residential mortgage loan servicing company headquartered in O'Fallon, Missouri. Collectively the three defendants identified in this paragraph are referred to here as "Citigroup." The business of Citigroup and its subsidiaries and affiliates, includes the origination and servicing of mortgage loans.  Defendant is a joint employers and/or joint tortfeasor.

13. Defendant J.P. Morgan Chase & Company is a diversified global financial services firm. It is a Delaware corporation, headquartered in New York, New York. On May 30, 2008, J.P. Morgan Chase & Company acquired The Bear Stearns Companies Inc. (now the Bear Stearns Companies LLC) by merger, including its subsidiary EMC Mortgage Corporation (now EMC Mortgage LLC). Defendant JPMorgan Chase Bank, N.A. is a national banking association. It is headquartered in Columbus, Ohio. On September 25, 2008, Washington Mutual Bank., F.S.B., a federal savings bank headquartered in Henderson, Nevada, failed, and J.P. Morgan Chase Bank, N.A., purchased substantially all of the assets and assumed all deposit and substantially all other liabilities of Washington Mutual Bank., F.S.B., pursuant to a Purchase and Assumption Agreement with the Federal Deposit Insurance Corporation (FDIC) and the FDIC as Receiver for Washington Mutual Bank, F.S.B. Collectively the two defendants identified in this paragraph are referred to here as "J.P. Morgan." The business of J.P. Morgan and its subsidiaries and affiliates

includes the origination and servicing of mortgage loans.  Defendant is a joint employers and/or joint tortfeasor.

14. Defendant Residential Capital, LLC is a residential real estate finance company. It is a Delaware limited liability company headquartered in Minneapolis, Minnesota. It is a wholly owned subsidiary of GMAC Mortgage Group, LLC. Defendant Ally Financial, Inc. (formerly GMAC, Inc.) is a diversified financial services firm. It is a Delaware corporation headquartered in Detroit, Michigan. Defendant GMAC Mortgage, LLC is a financial services company that engages in origination and servicing of residential mortgages. It is a Delaware limited liability company headquartered in Fort Washington, Pennsylvania. It was formerly known as GMAC Mortgage Corporation.  Defendant is a joint employers and/or joint tortfeasor.

15. Defendant GMAC Residential Funding Co. LLC is a residential mortgage servicing company. It is a Delaware corporation headquartered in Minneapolis, Minnesota. Collectively the four defendants identified in this paragraph are referred to here as "GMAC." The business of GMAC and its subsidiaries and affiliates, includes origination and servicing of mortgage loans.  Defendant is a joint employers and/or joint tortfeasor.

16. Defendant U.S. Bancorp is an American diversified financial services holding company headquartered in Minneapolis, Minnesota. It is the parent company of U.S. Bank, the fifth largest bank in the United States based on $353.8 billion in assets and fourth largest in the US in total branches. U.S. Bank ranks as the fifth largest bank in the U.S. based on deposits, with $243.8B in deposits as of December 31, 2012. With 3,080 banking offices and 5,085 ATMs, U.S. Bank's branch network serves 25 states. U.S. Bancorp offers regional consumer and business banking and wealth management services, national wholesale and trust services and global payments services to more than 15.8 million customers. The company employs over 63,000 people.  U.S. Bank National Association (U.S. Bank) is a nationally chartered bank, regulated by the Office of the Comptroller of the Currency, Department of the Treasury.  Defendant is a joint employers and/or joint tortfeasor.

17. Defendant HSBC Holdings PLC (commonly known as HSBC) is a British multinational banking and financial services company headquartered in London, United Kingdom. As of 2012, it was the world's third-largest publicly held bank and sixth-largest public company. HSBC is a universal bank and is organized within four business groups: Commercial Banking; Global Banking and Markets (investment banking); Retail Banking and Wealth Management; and Global Private Banking. It has around 7,200 offices in 85 countries and territories across Africa, Asia, Europe, North America and South America, and around 89 million customers. As of 31 March 2012 it had total assets of $2.637 trillion, of which roughly half were in Europe, the Middle East and Africa, and a quarter each in Asia-Pacific and the Americas. HSBC has a primary listing on the London Stock Exchange and is a constituent of the FTSE 100 Index. As of 6 July 2012 it had a market capitalization of £102.7 billion, the second-largest of any company listed on the London Stock Exchange. It has secondary listings on the Hong Kong Stock Exchange (where it is a constituent of the Hang Seng Index), the New York Stock Exchange, Euronext Paris and the Bermuda Stock Exchange. Defendant is a joint employers and/or joint tortfeasor.

18. Defendant EverBank is an American diversified financial services company providing banking, mortgages, and investing services. It is based in Jacksonville, Florida, U.S. It operates through standard banking offices, and through its Direct Banking division. EverBank Direct operates by telephone, mail, and over the Internet. As of September 30, 2012, EverBank had approximately $16.5 billion in total assets. Defendant is a joint employers and/or joint tortfeasor.

19. Defendant Sovereign Bank is a wholly owned subsidiary of the Spanish Santander Group. Based in Boston, Massachusetts, the bank—whose principal market is in the Northeastern United States—has more than $77 billion in assets, operates 723 retail banking offices, over 2,300 ATMs and employs approximately 8,500 people. Sovereign offers an array of financial services and products including retail banking, mortgages, corporate banking, cash management, capital markets, trust and wealth management, and insurance. Defendant is a joint employers and/or joint tortfeasor.

20. Defendant Credit Suisse Group AG is a Switzerland-based multinational financial services holding company headquartered in Zurich that operates the Credit Suisse Bank and other financial services investments. The company is organized as a stock corporation with four divisions: Investment Banking, Private Banking, Asset Management, and a Shared Services Group that provides marketing and support to the other three divisions:  Investment Banking, Private Banking, and Asset Management.  A Shared Services department provides support functions like legal, IT and marketing to all three areas. Operations are divided into four regions: Switzerland, Europe, the Middle East and Africa, the Americas and the Asian Pacific. Credit Suisse Private Banking has wealth management, corporate and institutional businesses. Credit Suisse Investment Banking handles securities, investment research, trading, prime brokerage and capital procurement. Credit Suisse Asset Management sells investment classes, alternative investments, real-estate, equities, fixed income products and other financial products. Defendant is a joint employers and/or joint tortfeasor.

21. Defendant Nationstar Mortgage Holdings, Inc. and its subsidiary Nationstar Mortgage, LLC are headquartered out of Lewisville, Texas.  The firm is one of the fastest-growing and more profitable companies in the mortgage servicing industry, buying troubled mortgages from big banks seeking to cut costs and comply with tougher banking regulations.   Recently in 2013, Nationstar Mortgage Holdings Inc announced that Nationstar Mortgage LLC, a wholly owned subsidiary, has signed a definitive agreement to acquire approximately $215 billion in residential MSRs, as measured by unpaid principal balance as of November 30, 2012, and certain other assets from Bank of America.  Furthermore, in 2013, Nationstar Mortgage Holdings Inc. also acquired a unit of Equifax Inc. that does appraisal, title insurance and settlement services in the United States.  Defendant is a joint employers and/or joint tortfeasor.

22. Defendant Select Portfolio Servicing, Inc. (SPS) is a loan servicing company founded in 1989 as Fairbanks Capital Corp. with operations in Salt Lake City, Utah and Jacksonville, Florida. In 2005, Select Portfolio Servicing was purchased by Defendant Credit Suisse, a financial services company, headquartered in Zürich, Switzerland. According to a Securities and Exchange Commission report (CFN: 1-6862) filed August 12, 2005, Credit Suisse First Boston (USA), Inc. now known as Credit Suisse, purchased Select Portfolio Servicing and its parent holding company for $144.4 million. Credit Suisse's Investment Banking Strategy included the acquisition of Select Portfolio Servicing, a mortgage servicing company. Defendant is a joint employers and/or joint tortfeasor.

23. Defendant Aurora Bank is a federal savings bank (FSB) headquartered in Wilmington, Delaware. It is a mid-size bank that offers full-scale banking services. Aurora Bank was founded on January 1, 1921 in Wilmington, Delaware under the name of Delaware Savings And Loan Association. On January 2, 1958, deposits made to the bank were first insured by the Federal Deposit Insurance Corporation (FDIC). In 1988, the bank was renamed to Delaware Savings Bank, FSB. On April 1, 2009, the bank changed its name to Aurora Bank, FSB. Aurora Bank was a subsidiary of Lehman Brothers Bancorp. In June, 2012, Aurora Bank exited most of the financial services business, with accounts transferred to other companies. Aurora Bank is regulated by the Office of the Comptroller of the Currency and the Federal Deposit Insurance Corporation. Aurora Bank has offices in California, Colorado, Indiana, Missouri, Nebraska, New Jersey and New York and offers: Retail Banking, Residential Mortgages, Residential Servicing, Residential Subservicing, Correspondent Lending, Commercial Loan Servicing, Third-Party Commercial Servicing. Aurora Bank FSB is chartered by the Office of Comptroller of the Currency and is a member of the Federal Home Loan Bank System; its deposits are insured to the extent permitted by law by the Federal Deposit Insurance Corporation (FDIC). Aurora Loan Services, LLC is a subsidiary of the Defendant. Defendant is a joint employers and/or joint tortfeasor.

24. Defendant Green Tree Services, LLC (hereby referred to as Green Tree), is a mortgage servicing company incorporated in Delaware with its principal place of business 300

Landmark Towers, 345 St. Peters St, St. Paul, MN 55102, doing business in 29 locations across the United States of America. With over 3,000 employees, Defendant Green Tree's offers a variety of mortgage related services for a wide range of assets types: residential mortgages; second liens; HELOC; consumer installment and the nation's largest portfolio of manufactured housing loans.  Defendant is a joint employers and/or joint tortfeasor.

25. Defendant PHH Corporation (NYSE: PHH) was founded in 1946 and is headquartered in Mount Laurel, New Jersey.  Its subsidiary, Defendant PHH Mortgage provides outsourced, private-label mortgage solutions to clients nationwide who are leaders in their fields of business, including financial institutions, real estate companies, credit unions, corporations and government agencies. In 2011 alone, PHH Mortgage closed nearly $52 billion in mortgage financing. The success of our outsourcing model has enabled PHH Mortgage to become one of the top 10 originators of retail residential mortgages in the United States.  PHH Mortgage also provides home financing directly to consumers.   Defendant is a joint employers and/or joint tortfeasor.

26. Defendant Phelan Hallinan & Schmieg, P.C., Phelan Hallinan & Schmieg, LLC (professional corporations under the laws of New Jersey, operating in Pennsylvania & New Jersey, hereby referred to as PHS), is a high-volume mortgage foreclosure law firm with Lawrence T. Phelan as its principal equity partner (49% and 41% respectively). Other equity partners include Francis S. Hallinan, head administrator of the firm, and Daniel G. Schmieg.  The affiliate companies engaged in PHS' foreclosure mill are Land Title Services of New Jersey Inc. and Full Spectrum Services Inc.  The Defendants maintain a principal office at 400 Fellowship Road, Suite 100, Mount Laurel, New Jersey 08054, an office at One Gateway Center, 11th Floor, Newark, New Jersey 07102, and their Pennsylvania operations at 617 J.F.K. Boulevard, Suite 1400, Philadelphia, Pennsylvania 19103.  Defendant is a joint employers and / or joint tortfeasor.

## IV.  **JURISDICTION AND VENUE**

27. This Court has personal jurisdiction over the Banks because the Banks have transacted business in this District, and because the Banks have committed acts proscribed by the False Claims Act in this District.

28. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964(c),  28 U.S.C. §1331 because the action arises under the laws of the United States, 28 USC § 1332 because this matters surrounds  disputes between citizens of different states, pursuant to 28 U.S.C. § 1333 the district courts shall have original jurisdiction, exclusive of the courts of the States because this matter involves executory and agency contracts-under water mortgages, and securities; pursuant to 28 U.S.C. § 1345 pursuant to 28 U.S.C. § 1355(a) because this is an action for the recovery or enforcement of a fine or penalty incurred under an Act of Congress, a joint enterprise engaged in racketeering, and pursuant to 31 U.S.C. § 3732(a) to the extent the claims arise under the False Claims Act,31 U.S.C. §§ 3729 to 3733.

29. Pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b), this Court has supplemental jurisdiction over the subject matter of the claims asserted by the States in this action because those claims are so related to the claims asserted by the United States that they form part of the same case or controversy, and because those claims arise out of the same transactions or occurrences as the action brought by the United States under the False Claims Act, 31 U.S.C. §§ 3729 to3733.

30. Venue is proper in this District pursuant to 18 USC § 1965, 28 U.S.C. § 1391(b) (1) and (2) and 31 U.S.C. § 3732(a).

## V.  **CONDITIONS PRECEDENT**

31. Pursuant to 31 USC § 3729 et seq, this Complaint is to be filed *in camera* and under seal, and is to remain under seal for a period of at least sixty days and shall not be served on Defendants until the Court so orders. Further, the United States Government may elect to

intervene and proceed with the action within the sixty day time frame after it receives both the Complaint and the material evidence submitted to it.

32. This suit is not based on prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, investigation; in the news media; or in any other location as the term "publicly disclosed" is defined in 31 U.S.C. § 3730, but rather information from Relator.

33. In the alternative, to the extent there has been a public disclosure unknown to Relator, he is an original source under the aforementioned statute. As more fully set forth in this Complaint, Relator has direct and independent knowledge of the information on which the allegations herein are based, and witnessed directly the fraudulent actions and representations by the Defendants against the United States, its 50 States and the District of Columbia, its departments or agents, and the homeowners across the United States of America.

34. Relator has voluntarily provided all of the material information alleged herein to the Federal government before filing this action based on said information.

35. Contemporaneous with filing this Complaint, Relator is serving a copy of same upon the United States, together with the aforementioned verbal and written disclosure statements setting forth and enclosing all material evidence and information he possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

36. Relator has complied with all other conditions precedent to bringing this action.

## VI.   FACTUAL BACKGROUND

### A.   Repeal of Glass Stegall Act

**The Glass–Steagall separation of commercial and investment banking was in four sections of the 1933 Banking Act.**

37. **Section 16:**  Section 16 prohibited national banks from purchasing or selling securities except for a customer's account (i.e., as a customer's agent) unless the securities were purchased for the bank's account as "investment securities" identified by the Comptroller of the Currency as permitted national bank investments. Section 16 also prohibited national banks from underwriting or distributing securities. Section 16, however, permitted national banks to buy, sell, underwrite, and distribute US government and general obligation state and local government securities. Such securities became known as "bank-eligible securities." Section 5(c) of the 1933 Banking Act (sometimes referred to as the fifth Glass–Steagall provision) applied Section 16's rules to Federal Reserve System member state chartered banks.

38. **Section 20:**  Section 20 prohibited any member bank of the Federal Reserve System (whether a state chartered or national bank) from being affiliated with a company that "engaged principally" in "the issue, flotation, underwriting, public sale, or distribution" of securities.

39. **Section 21:**  Section 21 prohibited any company or person from taking deposits if it was in the business of "issuing, underwriting, selling, or distributing" securities.

40. **Section 32:**  Section 32 prohibited any Federal Reserve System member bank from having any officer or director in common with a company "engaged primarily" in the business of "purchasing, selling, or negotiating" securities, unless the Federal Reserve Board granted an exemption.

### 1999 Gramm–Leach–Bliley Act

41. In 1999, the main issues confronting the new Leach bill to repeal Sections 20 and 32 of the Glass-Stegall Act were (1) whether bank subsidiaries ("operating subsidiaries") or only nonbank owned affiliates could exercise new securities and other powers and (2) how the Community Reinvestment Act (CRA) 12 U.S.C. 2901,[3] would apply to the new "financial holding companies" that would have such expanded powers. The Clinton Administration agreed with Representative Leach in supporting "the continued separation of banking and commerce."

42. On July 1, 1999, the House of Representatives passed (in a bipartisan 343-86 vote) a bill (H.R. 10) that repealed Sections 20 and 32. The Clinton Administration issued a statement supporting H.R. 10 because (unlike the Senate passed S. 900) it accepted the bill's CRA and operating subsidiary provisions.

43. On October 13, 1999, the Federal Reserve and Treasury Department agreed that direct subsidiaries of national banks ("financial subsidiaries") could conduct securities activities, but that bank holding companies would need to engage in merchant banking, insurance, and real estate development activities through holding company, not bank, subsidiaries. On October 22, 1999, Senator Gramm and the Clinton Administration agreed a bank holding company could only become a "financial holding company" (and thereby enjoy the new authority to affiliate with insurance and securities firms) if all its bank subsidiaries had at least a "satisfactory" CRA rating.

44. After these compromises, a joint Senate and House Conference Committee reported out a final version of S. 900 that was passed on November 4, 1999, by the House in a vote of 362-57 and by the Senate in a vote of 90-8. President Clinton signed the bill into law on November 12, 1999, as the Gramm–Leach–Bliley Financial Modernization Act of 1999 (GLBA).

---

[3] See http://www.ffiec.gov/cra/history.htm

45. The GLBA repealed Sections 20 and 32 of the Glass–Steagall Act, not Sections 16 and 21. The GLBA also amended Section 16 to permit "well capitalized" commercial banks to underwrite municipal revenue bonds (i.e., non-general obligation bonds), as first approved by the Senate in 1967. Otherwise, Sections 16 and 21 remained in effect regulating the direct securities activities of banks and prohibiting securities firms from taking deposits.

46. After March 11, 2000, bank holding companies could expand their securities and insurance activities by becoming "financial holding companies."

## B.  Overview of Relevant Federal Programs & Support of the Banks

### The Federal Housing Administration (FHA)

47. The FHA provides mortgage insurance on loans made by FHA approved lenders throughout the United States. Among other things, FHA insures mortgages on "single family" housing, which refers to one- to four- family dwellings. See, e.g., 12 U.S.C. § 1709; see generally 24 C.F.R. Part 203.

48. FHA mortgage insurance provides lenders with protection against losses when home buyers default on mortgage loans insured by FHA. See generally 12 U.S.C. § 1710, 24 C.F.R. Part 203.

49. FHA-approved lenders, known as Direct Endorsement Lenders, ensure that loans meet strict underwriting criteria, including income-verification, credit analysis, and property appraisal, established by the FHA to be eligible for insurance. See 24 C.F.R. § 203.5(c)-(e) (Direct Endorsement requirements for underwriter due diligence, mortgagor income evaluation and appraisal).

50. The FHA insurance operations are funded by a statutorily established Mutual Mortgage Insurance Fund (MMIF). 12 U.S.C. § 1708(a). The MMIF is sustained by insurance premiums, and the Secretary of the U.S. Department of Housing and Urban Development

is required to provide for an annual actuarial study to assess the financial position of the MMIF. 12 U.S.C. § 1708(a)(4), (7).

51. The FHA insurance program, by reducing the risk borne by approved lenders, is designed to stimulate lending to creditworthy borrowers, thereby increasing homeownership and aiding local communities in the form of community development, increased tax bases, and related benefits.

## The Department of Agriculture's Rural Housing Service
## Rural Housing Guarantee Program (RHS)

52. The RHS program provides mortgage insurance guarantees for loans made to qualified borrowers for housing in rural communities. See 7 C.F.R. § 1980.345 (applicant eligibility). The RHS partners with a broad range of eligible lenders. When an eligible lender certifies that all program requirements have been met, delivers a completed Loan Closing Report, and pays the guarantee fee, the RHS concurrently executes a loan note guarantee. 7 C.F.R. §§ 1980.309(a) (qualification of lenders), 1980.361 (issuance of loan note guarantee).

53. The RHS loan program is intended "to assist eligible households in obtaining adequate but modest, decent, safe, and sanitary dwellings and related facilities for their own use in rural areas." 7 C.F.R. § 1980.301(a). Like the FHA insurance program, the RHS program promotes lending to creditworthy borrowers that meet the Department of Agriculture's underwriting requirements.

**The United States Department of Veterans Affairs (VA)**
**Loan Guaranty Service Home Loan Program**

54. The VA Home Loan Program's guaranties are issued to help eligible service members, veterans, reservists and certain unmarried surviving spouses obtain homes, condominiums, residential cooperative housing units, and manufactured homes. 38 U.S.C. §§ 3701(b)(3), 3710(a), 3712. The primary purpose of the VA Home Loan Program is to help such individuals finance the purchase of homes on more advantageous terms than typically would be available to them.

55. The VA provides a repayment guarantee to qualified lenders equal to a specified percentage of the loan upon default of the primary debtor. 38 U.S.C §§ 3702(d), 3712(c)(2)-(3); 38 C.F.R. §§ 36.4202, 36.4225. Only loans meeting the VA's underwriting requirements are entitled to the VA's insurance guarantee.

56. By providing protection in the event of a default, the VA's insurance program encourages lenders to provide financing to veterans.

**The United States Trustee Program**

57. The United States Trustee Program is a component of the Department of Justice that seeks to promote the efficiency and protect the integrity of the Federal bankruptcy system. To further the public interest in the just, speedy and economical resolution of cases filed under the Bankruptcy Code, the Program monitors the conduct of bankruptcy parties and private estate trustees, oversees related administrative functions, and acts to ensure compliance with applicable laws and procedures. It also identifies and helps investigate bankruptcy fraud and abuse in coordination with United States Attorneys, the Federal Bureau of Investigation, and other law enforcement agencies.

58. The primary role of the U.S. Trustee Program is to serve as the "watchdog" over the bankruptcy process.

59. United States Trustees supervise the administration of liquidation proceedings under Chapter 7 of the Bankruptcy Code, reorganization proceedings under Chapter 11, family farm and fisherman reorganization proceedings under Chapter 12, and "Wage-earner" reorganization proceedings under Chapter 13.

60. Specific responsibilities of the United States Trustees include appointing and supervising private trustees who administer Chapter 7, 12, and 13 bankruptcy estates (and serving as trustees in such cases where private trustees are unable or unwilling to serve); taking legal action to enforce the requirements of the Bankruptcy Code and to prevent fraud and abuse; referring matters for investigation and criminal prosecution when appropriate; ensuring that bankruptcy estates are administered promptly and efficiently, and that professional fees are reasonable; appointing and convening creditors' committees in Chapter 11 business reorganization cases; reviewing disclosure statements and applications for the retention of professionals; and advocating matters relating to the Bankruptcy Code and rules of procedure in court.

## The Single Family Mortgage Industry

61. The single family mortgage industry consists of financial services and other firms that originate, underwrite, securitize, and service mortgages for residential properties designed to house one- to four-family dwellings.

62. Mortgage origination is the process whereby a lender loans money to a borrower and receives a security interest in property, through a mortgage or comparable device that secures the loan. Origination generally includes all the steps from receiving a loan application through disbursal of the loan proceeds.

63. For more than thirty years, mortgages typically have been "pooled" to create an investment vehicle, often denominated as a trust, and interests in the trusts have been sold

to investors that own interests in payment streams generated by principal and interest payments by the borrowers.

64. After mortgages are originated, a "servicer" is responsible for mortgage administration activities, known as servicing activities, which generally include collecting payments from mortgagors; applying payments made in an agreed-upon order to the mortgagor's indebtedness; distributing payments after allowable deductions to the investment trust entities for distribution to investors; making advances to cover delinquent mortgage payments and other costs, such as the costs of protecting and maintaining properties that collateralize mortgage loans when mortgagors fail to do so; pursuing collections from delinquent mortgagors; and pursuing either loss mitigation or foreclosure, as appropriate, to minimize the loss to investors and others when mortgagors become delinquent on mortgage payments.

## C. Financial Crisis of 2008: The United States' Stimulus / Rescue Efforts

65. From 2004 to 2008, U.S. financial institutions issued nearly $2.5 trillion in RMBS and over $1.4 trillion in CDO securities, backed primarily by mortgage related products. Investment banks, including Defendants Goldman and Deutsche, typically charged fees of $1 to $8 million to act as the underwriter of an RMBS securitization, and $5 to $10 million to act as the placement agent for a CDO securitization. Those fees contributed substantial revenues to the investment banks, which established internal structured finance groups, as well as a variety of RMBS and CDO origination and trading desks within those groups, to handle mortgage related securitizations. Investment banks sold RMBS and CDO securities to investors around the world, and helped develop a secondary market where RMBS and CDO securities could be traded. The investment banks' trading desks participated in those secondary markets, buying and selling RMBS and CDO securities either on behalf of their clients or in connection with their own proprietary transactions.

66. By the fall of 2008, America suffered a devastating economic collapse. Once valuable securities lost most or all of their value, debt markets froze, stock markets plunged, and storied financial firms went under. Millions of Americans lost their jobs; millions of families lost their homes; and good businesses shut down. These events cast the United States into an economic recession so deep that the country has yet to fully recover. As a result, in October 2008, the Defendants were recipients of $700 Billion+ from the Treasury and American tax payers, in the form of Troubled Asset Relief Programs (TARP), and recipients of $1.2 Trillion+ in Federal Reserve Emergency Funds, to promote liquidity in the financial markets, and in part, provide homeowners relief.

67. Beginning in the fall of 2008, the federal government instituted several measures to try to stabilize the housing and credit markets and assist troubled homeowners. In October 2008, the Emergency Economic Stabilization Act of 2008 (EESA) was passed to promote stability and liquidity in the financial system. Among other things, EESA authorized the Secretary of the Treasury to establish the Troubled Asset Relief Program (TARP). TARP funds were used, in part, to promote various mortgage loan modification programs.

  I.  *The Making Home Affordable (MHA) Program.* In March 2009, the United States launched the MHA Program. The MHA Program included the Home Affordable Modification Program (HAMP), a Treasury program that uses TARP funds to provide incentives for mortgage servicers to modify eligible first lien mortgages.

  HAMP uses incentive payments to encourage loan servicers and owners of mortgage loans or bonds backed by mortgage loans to modify eligible first lien mortgages so that monthly payments of homeowners who are in default or at imminent risk of default will be reduced to affordable and sustainable levels.

  II. *The Home Price Decline Protection Incentives (HPDP) initiative.* The HPDP initiative is designed to encourage modifications of loans in

23

markets hardest hit by falling home prices. The HPDP initiative provides investors with additional incentives for loan modifications on properties located in areas where home prices have recently declined and where investors are concerned that price declines may persist.

III.  *The Principal Reduction Alternative (PRA).* PRA is designed to encourage the use of principal reduction in modifications for eligible borrowers whose homes are worth significantly less than the remaining outstanding principal balances of their first-lien mortgage loans. It provides investor incentives to offset a portion of the principal reduction.

IV.  *The Home Affordable Unemployment Program (UP).* UP is designed to offer assistance to unemployed homeowners through temporary forbearance of a portion of their mortgage payments.

V.  *The Home Affordable Foreclosure Alternatives Program (HAFA).* HAFA is designed to provide incentives to servicers, investors and borrowers to utilize short sales and deeds-in-lieu of foreclosure for HAMP-eligible loans in cases in which the borrower can no longer afford to stay in their home but want to avoid foreclosure. Under this program, the servicer releases the lien against the property and the investor waives all rights to seek a deficiency judgment against a borrower who uses a short sale or deed-in-lieu when the property is worth less than the outstanding principal balance of the mortgage.

VI.  *The Second Lien Modification Program (2MP).* 2MP is designed to modify second lien mortgages when a corresponding first lien is modified under HAMP.

VII.  *The FHA-HAMP Program.* The FHA-HAMP Program is designed to provide compensation to the holders and servicers of FHA-insured

24

mortgages that are modified under FHA-HAMP, to reduce payments to more affordable levels.

VIII. *The Treasury/FHA Second-Lien Program (FHA2LP).* FHA2LP is designed to facilitate refinancing under the FHA Short Refinance Program by reducing second liens. Treasury provides incentives to participating servicers and investors who agree to partial or full extinguishment of second liens associated with an FHA refinance.

IX. *The FHA Refinance for Borrowers with Negative Equity (FHA Short Refinance) Program.* This program is partially supported by TARP funds and allows servicers and investors who write down a borrower's principal balance on a non-FHA-insured, existing, underwater, first-lien mortgage loan in connection with a refinancing to obtain FHA insurance on the newly refinanced mortgage. Treasury has provided a TARP-funded letter of credit for up to $8 billion in loss coverage on these newly refinanced FHA loans.

X. *Housing Finance Agency Hardest Hit Fund (HHF).* HHF is a TARP-funded program designed to fund foreclosure prevention programs run by state housing finance agencies in states hit hardest by the decrease in home prices and in states with high unemployment rates. Eighteen states and Washington, D.C. have received approval for aid through this program.

### D. <u>Fraudulent Enforcement Recovery Act (FERA)</u>

68. On May 20, 2009, the FERA was enacted into law, enhancing criminal enforcement of federal fraud laws, especially regarding financial institutions, mortgage fraud, and securities fraud or commodities fraud.

69. Section 4 of FERA restates part of the False Claims Act, to "reflect the original intent of the law". This amendment is in reaction to the Supreme Court's 2008 decision in *Allison Engine Co. v. United States ex rel. Sanders*, in which the Court held that the mere involvement of Federal money was insufficient to bring a fraudulent claim or invoice within the scope of the False Claims Act. The amended subsection (a) of 31 U.S.C. § 3729 effectively reverses the *Allison Engine* decision, weakening the requirement to "a false record or statement material to a false or fraudulent claim", where a *claim* includes "any request or demand" related to a government program and which will be paid from funds supplied by the government.

### E.  Dodd – Frank Act

70. On July 21, 2010, the Dodd–Frank Wall Street Reform and Consumer Protection Act (Pub.L. 111–203, H.R. 4173) was signed into federal law by President Barack Obama as a response to the late-2000s recession.  The Dodd-Frank Act brought the most significant changes to financial regulation in the United States since the regulatory reform that followed the Great Depression.  It made changes in the American financial regulatory environment that affect all federal financial regulatory agencies and almost every part of the nation's financial services industry.

71. The stated aim of the legislation is:

> To promote the financial stability of the United States by improving accountability and transparency in the financial system, to end "too big to fail", to protect the American taxpayer by ending bailouts, to protect consumers from abusive financial services practices, and for other purposes.

72. The Act changed the existing regulatory structure, such as creating a host of new agencies (while merging and removing others) in an effort to streamline the regulatory process, increasing oversight of specific institutions regarded as a systemic risk, amending the Federal Reserve Act, promoting transparency, and additional changes. The Act purports to provide rigorous standards and supervision to protect the economy and

American consumers, investors and businesses, purports to end taxpayer funded bailouts of financial institutions, claims to provide for an advanced warning system on the stability of the economy, creates rules on executive compensation and corporate governance, and eliminates some loopholes that led to the 2008 economic recession.

### F.  50 U.S. Attorney Generals Civil Complaint March 2012

**73.** In March 2012, the 50 U.S. Attorney Generals brought charges under the False Claims Act, 31 U.S.C. §§ 3729 to 3733, alleging that Bank of America, Wells Fargo & Company, JP Morgan Chase, Citi, Ally Bank / GMAC, and their affiliates engaged in unfair and deceptive practices towards U.S. homeowners as it pertains to loan originations, loan servicing, loss mitigation, foreclosure, and bankruptcy.  In addition, the allegations included the Banks' breach of their contractual obligations per TARP, violation of state, and federal laws.  Hence, Relator, in his capacity as a licensed New Jersey relator and operator of a maintenance company providing REO services to the Defendant, alleges and believes the Defendants and their affiliates are still engaging in unfair and deceptive loan servicing, loss mitigation, foreclosure, and bankruptcy practices across the United States of America.

### VII.    FACTUAL ALLEGATIONS:

**National Mortgage Settlement Allegations Confirmed by Relator as Ongoing & Unchecked**

#### A.  Roger v. Goldman Sachs Group, Inc., et. al.

**74.** Relator has been a licensed New Jersey realtor, assisting buyers and sellers with residential real estate transaction in which the Defendants and their affiliates were involved.  In addition, Relator performs Broker Price Opinions as a licensed New Jersey realtor, for the Defendants and their affiliates.  Furthermore, the Relator is the owner of a maintenance company, performing REO residential services for the Defendants from 2009 to Present.

75. In the Fall of 2010, the Relator listed  for short sale, the residential New Jersey home owned by the pro se complainant Frances Rogers, an over inflated, underwater mortgage in the predominately African American Township of Willingboro, serviced by Defendant Litton, on behalf of GSAMP Trust 2007 – NC1.[4]

76. On December 20, 2010, the Hon. Mary C. Jacobson, Presiding Judge of the Chancery Court in Mercer County, New Jersey, *sua sponte* initiated an action titled *"In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities"*, Docket No. F-059553-10 *("Foreclosure Irregularities Matter")*. Judge Jacobson's Order required certain mortgage servicers to explain and justify their foreclosure practices to a Special Master appointed by the Court *("Show Cause Order")* as a condition to continued prosecution of uncontested residential foreclosure actions in New Jersey.[5]

77. Judge Jacobson held that *"the exigencies of the circumstances, especially the immediate need to restore integrity to foreclosure processing,"* required *"an in-depth review to ensure that [mortgage servicers'] employees, agents, servants or third-party independent contractors acting on their behalf follow proper policies, procedures and processes."* Judge Jacobson identified that several mortgage services as having been *"implicated in irregularities in connection with their foreclosure practices,"* which demonstrated *"a public record of questionable practices[6] that this court must address now in its supervisory capacity over the processing of foreclosure matters."* The public record identified by Judge Jacobson was summarized in Director Grant's Order.

---

[4] See http://www.fhfa.gov/Default.aspx?Page=110  for FHFA's suit against 17 Banks for selling the GSE's toxic RMBS underlined by toxic mortgages.
[5] See http://www.judiciary.state.nj.us/notices/2010/n101220c.pdf

[6]See http://www.lsnj.org/NewsAnnouncements/Foreclosure/materials/LSNJReport.pdf for *"Legal Services of New Jersey Report and Recommendation to the New Jersey Supreme Court Concerning False Statements And Swearing In Foreclosure Proceedings November 4, 2010."*

78. Among other things, Director Grant specifically singled out the fraudulent notarization practices of Defendant PHS,[7] the law firm / debt collector hired by the Defendants, a non MERS member, executing thousands of mortgage assignments on behalf of the Defendants and their affiliates, also initiating fraudulent foreclosures on homeowners throughout New Jersey and Pennsylvania, behalf of the Banks,.[8]  Director Grant's specifically singled out the fraudulent notarization practices of the PHS and their company Full Spectrum, stating in part...

> "In state court proceedings, Thomas Strain, an employee of a servicing company associated with the New Jersey and Pennsylvania law firm of PHS, admitted in a deposition to notarizing approximately fifty foreclosure-related documents per day, often outside the signer's presence.  After New Jersey Chancery Division judges expressed concerns related to PHS' mortgage assignment practices, PHS spent $175,000 to redo approximately 3,000 assignments that Strain had notarized."[9]

79. From January 1, 2009 to December 31, 2010, Goldman initiated 135,586 foreclosures on homeowners throughout the U.S. through its mortgage servicing subsidiary Litton, including the June 30, 2009 foreclosure complaint filed against the Plaintiff on June 30, 2009, the same day her husband, the late Thomas Rogers (diagnose with live cancer in

---

[7] See _Giles v. Phelan Hallinan & Schmieg, PC, Wells Fargo Bank, N.A., et. al._ for the 2011 class action suit filed by homeowners in NJ and PA, alleging the law firm civil aided and abetted the unfair and deceptive mortgage related practices of Wells Fargo, who is also a Board of Director and shareholder of MERS.

[8] See _Roger v. Brad A. Morrice, et. al._ for the 2012 suit filed by an African American NJ homeowner, against several of the Defendant Banks and the law firm PHS for unfair and deceptive mortgage related practices to which the Plaintiff's husband succumbed the same day the Defendants filed a fraudulent foreclosure complaint, and conspired to deprive the widow of her money, and property from 2009 to present. Also see EXHIBITS – PHS ROBOSIGNING, ROBOSIGNING CHART 2013, BUR CMD CTY SHERIFF SALES 2013, & AUDITS

[9] See also Brian Ahearn, _When Lawyers Neglect the Legal Details_, BERGEN RECORD, Jan. 4, 2011 (citing _"concern about Phelan's mortgage practices"_ expressed by New Jersey Chancery Division judges), http://www.northjersey.com/columnists/ahearn/ahearn_010511.html?page=all and Mary Pat Gallagher, Law Firm Hit With Racketeering Suit Over Alleged Wrongful Foreclosures, 206 N.J.L.J,388 (Oct. 31, 2011) (The Phelan firm "was made an example of last year when the judiciary took action against robo-signing and other improper foreclosure practices").

2006 and a heart surgery patient in 2008), succumbed to the stress from the deliberate foreclosure scheme initiated by Goldman and its co-conspirators.[10]

80. In June 2011, the pro se complaint filed for Chapter 7 Bankruptcy, while Defendant Litton, simultaneously denied several proposals to purchase the Plaintiff's property, sent to the Relator in his capacity as the listing realtor for the property.  Hence, the property was never sold or foreclosed, and an examination the mortgage documents in possession of the homeowner, and recorded with the Burlington County Clerks' office, reveal the unfair and deceptive practices of the Defendants and their affiliates, as alleged in Roger v. Goldman Sachs Group, Inc., et. al., and displayed throughout the attached exhibits.[11]

## B. Collusion Case Study - 2013 Memorandum

81. The Relator, in his capacity as a realtor became aware of his clients, co-workers, family, and friends, all of whom were entangled by unfair and deceptive practices of the Defendants' as it pertained to loan originations, loan servicing, loss mitigation, foreclosures, and bankruptcy proceedings.  In addition, as the owner of a maintenance company and while performing Broker Price Opinions reports, property preservation, inspections, and keys for cash negotiations in which Relator was offered compensation to persuade the homeowners / tenants being sought for foreclosure, to move out for a menial amount, increasing begin to question the motives of the Defendants' and their affiliates.

82. In 2012, the pro se complainant in Roger v Brad A. Morrice, et. al., decided to bring a civil complaint against several of the Defendants named to this complaint, and the Relator performed a complete audit of the homeowners' relevant mortgage documents of which included the mortgage discharges, loan originations, note assignments, lis pendens, the 424B prospectus for GSAMP Trust 2007 – NC1, along with the information sent

---

[10] See Roger v. Brad A. Morrice, et. al. and Wanda Jo. Engel v. JP Morgan Chase, et. al., two cases in which the Defendants and their affiliates engaged in unfair and deceptive mortgage related practices, that contributed to the deaths of two elderly homeowners.  Also see EXHIBIT – COMMON LAW GROSS RECKLESS MANSLAUGHTER.

[11] See – EXHIBITS – STAFFORD LANE, AUDITS, ROBOSIGNING CHART, PHS ROBOSIGNING

from the Defendants to the pro se complaint and her late spouse, a cancer and heart surgery patient, who died on June 30, 2009, the same day his mortgage note assigned by a PHS employee / attorney acting as the Vice President of MERS to GSAMP Trust 2007 – NC1, 28 months after the cut-off / closing date.

83. Today, the one mortgage audit performed for the property subject to Roger v. Goldman Sachs Group, Inc., et. al., has multiplied into an interstate audit of thousands of transactions by the Defendants, occurring before March 2012's National Mortgage Settlement, during the settlement, and after the settlement, leading to the creation of the Collusion Case Study 2013,[12] which was then converted into a Memorandum by the pro se Plaintiff in Roger v. Goldman Sachs Group Inc., et. al. Hence, come March 7th, and 8th of 2013, and every Thursday and Friday thereafter, Burlington and Camden County homeowners' will witness the fraudulent foreclosures, resulting from robo-signing by the Defendants and their affiliates.[13]

84. Thus, infamous robo-signers such as "Linda Green" of DOCX, Judith T. Romano of PHS, other agents of the Defendant Banks, and their affiliates, are causing homeowners throughout South Jersey to be unlawfully foreclosed within days. Thus, the allegations made by the 50 U.S. Attorney Generals in March 2012's National Mortgage Settlement between the 5 of the Defendant Banks and their subsidiaries, and the Settlement announcement of January 2013 by 12 Banks, are for naught because the Defendants and their affiliates continue to violate the rights of homeowners, state and federal laws, and ignore the sanctions set forth by U.S. Authorities.

85. The Relator alleges and believes that Defendant Banks, as shareholders, board of Directors, and Members of MERSCORP Holdings & Mortgage Electronic Systems (MERS), are a joint enterprise, engaged in racketeering, disrupting interstate and foreign commerce, further evident by international investigations and sanctions for the

---

[12] See EXHIBIT – COLLUSION CASE STUDY 2013 – MEMORANDUM
[13] See EXHIBITS – BUR CMD CTY SHERIFF SALES 2013, AUDITS, ROBOSIGNING CHART 2013.

manipulation of Libor.[14]  Furthermore, officers of the court such as the law firm of PHS, a non MERS member, are civil aiding and abetting fraud, of which includes the unfair and deceptive foreclosure and bankruptcy proceedings of the Defendant Banks and their affiliates in the State of New Jersey and Pennsylvania.

86. For the Defendants to defraud working homeowners and citizens of the U.S. as it pertains to unfair and deceptive mortgage related practices, is unjust.  However, to defraud Public Officials of which includes the District Court Justices of New Jersey, the Burlington and Camden County Sheriffs, and former Presidential hopeful Sarah Palin,[15] using the same tactics alleged within the National Mortgage Settlement of 2012, and displayed within the supporting memorandum and exhibits, is reckless, arrogant, and displays the danger presented by the Defendants, and the harm caused to the homeowners across the U.S., investors, the States, Government, interstate and foreign commerce.

## C.  **EXHIBIT - CASE STUDY 7**

87. On February 28, 2013,[16] Relator in his capacity as a licensed New Jersey realtor, sold a home to an African American family who became first time homeowners, by financing a property through First Financial Services Inc. as the lender, and MERS[17] as the nominee and mortgagee.  The homeowner's first payment is due April 1, 2013, and will most likely be paid to one of the Defendant Banks, named by the 50 U.S. Attorney Generals in the National Mortgage Settlement of 2012, or their affiliates, acting as the servicer / debt collector.

---

[14] See http://uk.reuters.com/article/2013/02/24/uk-deutschebank-libor-jain-idUKBRE91N07Y20130224 , for Libor manipulation article.  See BBA Libor details, http://www.bbalibor.com/bbalibor-explained .  See NY Times Libor Report
http://topics.nytimes.com/top/reference/timestopics/subjects/l/london_interbank_offered_rate_libor/index.html

[15] See EXHIBIT – PUBLIC OFFICIALS WERE ROBOSIGNED
[16] See EXHIBITS – CASE STUDY 7, AUDITS, AND ROGOSIGNING CHART 2013.
[17] In 2011, United States Bankruptcy Judge Robert Grossman declared MERS an illegal business model, see http://www.huffingtonpost.com/l-randall-wray/new-yorks-us-bankruptcy-c_b_824167.html

88. Furthermore, 25 Maplewick Lane, Willingboro, New Jersey displays the unfair and deceptive mortgage related practices of BANA and its affiliates.  Hence, in retrospect to the questioning of Defendant BANA by myself and the homeowner regarding who is the note holder, stemming from the fraud discovered within the Burlington County Clerk, and information admitted to by agents of BANA through mail and wire, the firm has sold the homeowners' mortgage note to Nationstar Mortgage Holdings, Inc.'s subsidiary, Nationstar Mortgage, LLC.[18]  Thus, this homeowners' chain of title has been corrupted by the infamous robo-signing machines Linda Green of DOX and MERS.

89. Hence, barring any forewarning to the Defendant Banks and their affiliates, based upon the pattern demonstrated in the audits performed and provided as exhibits, the mortgage servicer to be determined for the note originated on February 28, 2013, and the new servicer for 25 Maplewick Lane, will engage in the unfair and deceptive mortgage related practices alleged by the 50 U.S. Attorney Generals in their March 2012 civil suit, and substantiated within the evidence provided by the Relator, thus, demonstrating the ongoing, unlawful conduct of the Defendants, and their affiliates, despite ongoing litigation, settled suits, Government sanctions, and international investigations.   Case Study 7 was withheld from the Collusion Case Study 2013 – Memorandum provided the pro se complainant in Roger v. Goldman Sachs Group, Inc., et. al., and filed March 6, 2013.

### D.  BURLINGTON CAMDEN COUNTY SHERIFF SALES 2013

90. The supporting exhibit attached titled EXHIBIT – BUR CMD CTY SHERIFF SALES 2013, reveals pending foreclosures this upcoming March 7th and 8th, 2013, and every Thursday and Friday thereafter, in Burlington and Camden County New Jersey.  Hence, these foreclosures are marred by robo-signing executed by the Defendants and their affiliates, displaying signatures by "Linda Green" of DOCX, executing mortgage assignments dating back years, thus, still causing havoc on homeowners, of which

---

[18] See http://www.bizjournals.com/dallas/news/2013/01/07/nationstar-to-buy-215b-in-mortgage.html for BANA offloading billions in mortgage assets to Nationstar Mortgage Holdings, Inc.

includes servicemembers,[19] the court system, and the State of New Jersey.[20]  The Relator alleges and believes that the robo-signing of mortgage documents by the Defendants and their affiliates, cited in the National Mortgage Settlement of March 2012, is ongoing, resulting fraudulent foreclosures of U.S. homeowners across the country,  and the violations are being fraudulently concealed by the Defendants and their affiliates, despite the sanctions from Government Authorities.

91. With a twist of irony, the Relator has discovered that NJ's District Judges and the Sheriffs of Burlington and Camden County New Jersey, who are respectively, dismissing mortgage fraud cases brought by homeowners against the Banks, and executing foreclosures on behalf of the Defendants and their affiliates, are also victims of the unlawful mortgage related practices affecting millions of U.S. homeowners across the United States, the 50 States, and the District of Columbia.[21]

## COUNT I
## UNFAIR AND DECEPTIVE CONSUMER PRACTICES
## WITH RESPECT TO LOAN SERVICING

92. The allegations in paragraphs 1 through 89 above are incorporated herein by reference.

93. The loan servicing conduct of the Banks, as described above, constitutes unfair or deceptive practices in violation of the consumer protection laws of each State.

94. The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws.

---

[19] See EXHIBITS – VIOLATIONS OF SERVICEMEMERS, BUR CMD CTY SHERIFF SALES 2013, AUDITS, ROBOSIGNING CHART 2013
[20] See EXHIBITS – BUR CMD CTY SHERIFF SALES 2013, AUDITS, & ROBOSIGNING CHART 2013
[21] See EXHIBITS – PUBLIC OFFICIALS WERE ROBOSIGNED,  AUDITS, & ROBOSIGNING CHART 2013

The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.  The Relator alleges the unlawful conduct of the Defendants is ongoing present day, evident within the recent Libor manipulation discoveries, for many of the mortgages audited, and documented within the supporting exhibits are subject to Libor.

## COUNT II
### UNFAIR AND DECEPTIVE CONSUMER PRACTICES
### WITH RESPECT TO FORECLOSURE PROCESSING

95. The allegations in paragraphs 1 through 89 above are incorporated herein by reference.

96. The foreclosure processing conduct of the Banks, as described above, constitutes unfair or deceptive practices in violation of the consumer protection laws of each State, as alleged by the 50 U.S. Attorney Generals in March 2012's civil complaint, and are ongoing present day.

97. The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.  The Relator alleges the Defendants unlawful conduct is ongoing present day, despite the National Mortgage Settlement of March 2012.

## COUNT III

## VIOLATIONS OF THE FALSE CLAIMS ACT,

### 31 U.S.C. § 3729(a)(1)(A), (a)(1)(B), (a)(1)(C) and (a)(1)(G) (2009), and 31 U.S.C. §3729(a)(1), (a)(2), (a)(3) and (a)(7) (1986)

98. The allegations in paragraphs 1 through 89 above are incorporated herein by reference.

99. By virtue of the acts described above, the Banks knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval, including but not limited to improper claims for payment of FHA residential mortgage insurance or guarantees.

100.    In so doing, the Defendants acted knowingly; that is, the Banks possessed actual knowledge that the claims for payment were false or fraudulent; acted in deliberate ignorance of the truth or falsity of the claims for payment; or acted in reckless disregard of the truth or falsity of the claims for payment.

101.    By virtue of the acts described above, the Banks made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.

102.    In so doing, the Defendants acted knowingly; that is, the Banks possessed actual knowledge that the information, statements and representations were false or fraudulent; acted in deliberate ignorance of the truth or falsity of the information, statements and representations; or acted in reckless disregard of the truth or falsity of the information, statements and representations.

103.    By virtue of the acts described above, the Banks made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, and concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the United States.

104.     In so doing, the Defendants acted knowingly; that is, the Banks possessed actual knowledge that the information, statements and representations were false or fraudulent; acted in deliberate ignorance of the truth or falsity of the information, statements and representations; or acted in reckless disregard of the truth or falsity of the information, statements and representations.

105.     By virtue of the acts described above, the Banks conspired with one or more persons: to present or cause to be presented to the United States false or fraudulent claims for payment or approval; to make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim; and, to make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government; or to conceal or improperly avoid or decrease an obligation to pay or transmit money or property to the United States. The Relator alleges the Defendants conduct is going present day post National Mortgage Settlement of March 2012.

## COUNT IV
## VIOLATION OF THE FINANCIAL INSTITUTIONS
## REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989,
## 12 U.S.C. § 1833A (FIRREA)

106.     The allegations in paragraphs 1 through 89 above are incorporated herein by reference.

107.     The Banks knowingly made or presented false and fictitious claims to Departments of the United States.

108.     The claims were material to decisions of the United States.

109.     In connection with matters within the jurisdiction of the United States, the Banks knowingly and willfully engaged in conduct that: (a) falsified, concealed or covered up

by artifices, schemes or devices, material facts, (b) made statements and representations that violate 18 U.S.C. § 1001(a), and (c) made and used false writings or documents knowing the same to contain materially false and fictitious statements and entries.

110.    The Defendants' schemes affected federally insured financial institutions, and the Relator alleges the same schemes are ongoing present day, post the National Mortgage Settlement of March 2012.

## COUNT V
## VIOLATION OF THE SERVICEMEMBERS CIVIL RELIEF ACT,
## 50 U.S.C. APP. §§ 501, ET SEQ.

111.    The allegations in paragraphs 1 through 89 above are incorporated herein by reference.

112.    The financial firms engaged in the wrongful conduct described herein violated the protections afforded servicemembers by the SCRA and 50 U.S.C. App. §§ 521, 527 and 533 and constituted a pattern or practice of violation.

113.    The servicemembers affected by such wrongful conduct suffered damages and are aggrieved persons under the SCRA.

114.    The financial firms engaged in the wrongful conduct described herein acted intentionally, willfully, and/or in disregard of the rights of the affected servicemembers.

**COUNT VI**

**DECLARATORY JUDGMENT UNDER 28 U.S.C. §§ 2201 and 2202**
**REGARDING THE BANKS' BANKRUPTCY MISCONDUCT**

115.     The allegations in paragraphs 1 through 89 above are incorporated herein by reference.

116.     The Banks implemented and relied on inadequate bankruptcy procedures and thereby have prejudiced debtors, creditors, including the United States, and the courts in bankruptcy cases, have caused increased errors, delays, and costs of administration in bankruptcy cases, and constitute a continuing abuse of the bankruptcy process.

117.     The Banks implemented and relied on inadequate bankruptcy procedures and thereby have violated the standards of conduct required of creditors by applicable law, including the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, or have caused violations of such law.

118.     The Banks implemented and relied upon inadequate bankruptcy procedures that abused the bankruptcy process.

119.     The Banks' unlawful conduct has resulted in injury to the United States and to debtors in bankruptcy who have had their home loans serviced by the Banks. The harm sustained by such debtors includes payment of improper fees and charges, unreasonable delays and expenses in their bankruptcy cases, and loss of homes due to improper, unlawful, or undocumented foreclosures. The harm sustained by the United States includes reduced and delayed recoveries to the United States in its capacity as a creditor in bankruptcy cases. Such conduct has also caused the United States to assume increased administrative duties in monitoring bankruptcy cases, and to incur expenses in the investigations and litigation of the Banks' unlawful conduct.

## COUNT VII

## DAMAGES UNDER COMMON LAW
## RELATED TO THE BANKS' BANKRUPTCY MISCONDUCT

120.    The allegations in paragraphs 1 through 89 above are incorporated herein by reference.

121.    The Banks implemented and relied on inadequate bankruptcy procedures and thereby has prejudiced debtors, creditors, including the United States, and the courts in bankruptcy cases, has led to increased errors, delays, and costs of administration in bankruptcy cases, and constitutes a continuing abuse of the bankruptcy process.

122.    The Banks' abuse of the bankruptcy process violated a duty or duties owed by the Banks to the debtors, the courts, and other parties in such bankruptcy cases, including the United States.

123.    The Banks' abuse of the bankruptcy process violates a federal policy, reflected in the Bankruptcy Code and the Bankruptcy Rules, in favor of the efficient and equitable administration of bankruptcy cases, as well as the policy of ensuring accuracy in claims submitted to the bankruptcy courts.

124.    The Banks' unlawful conduct has resulted in injury to the United States and to debtors in bankruptcy who have had their home loans serviced by the Banks. The harm sustained by such debtors includes payment of improper fees and charges, unreasonable delays and expenses in their bankruptcy cases, and loss of homes due to improper, unlawful, or undocumented foreclosures. The harm sustained by the United States includes reduced and delayed recoveries to the United States in its capacity as a creditor in bankruptcy cases. Such conduct has also caused the United States to assume increased administrative duties in monitoring bankruptcy cases, and to incur expenses in the investigations and litigation of the Banks' unlawful conduct.

## COUNT VIII

**Mail Fraud- 18 USC § 1341 - Frauds and swindles**
**Wire Fraud-18 USC § 1343**
**Private Right of Action Pursuant to Federal Rico Act**
**18 U.S.C. 1962 (a), (b), (c), (d),**

125.    The allegations in paragraphs 1 through 89 above are incorporated herein by reference.  The fraudulent loan origination, loan servicing, assignment of mortgage notes, loss mitigation, foreclosure and bankruptcy proceedings, manipulation of the Libor, and deliberate breach of contractual obligations per TARP guidelines, as described above constitutes a systematic, interstate and foreign, ongoing racketeering, joint enterprise, in direct violation of the consumer protection laws of New Jersey, the other 49 States, and Federal laws.

126.    The GSEs', in conservatorship of the Government since 2008, are on the Board of Directors for MERSCORP Holdings, and shareholders of MERS.  Hence, the Defendants, also Board of Directors, shareholders, MERS members, and non-MERS members, are directing the fraudulent robo-signing activities demonstrated by MERS.  Furthermore, MERS is an electronic system, engaged in wire communications that are underlined in fraud and deceit, as demonstrated within EXHIBIT - Collusion Case Study 2013 – Memorandum, and supporting exhibits.

127.    The alleged violations of the Defendants' are occurring to date despite Foreign and U.S. led investigations, sanctions, and lawsuits, of which includes the 50 U.S. Attorney General March 2012 civil complaint, addressing the unfair and deceptive mortgage related practices of the Defendants.

128.    By virtue of the acts described above, the Defendants conspired with one or more persons: to present or cause to be presented to the United States false or fraudulent claims for payment or approval; to make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim; and, to make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government; or to conceal or improperly avoid or decrease an obligation to pay or transmit money or property to the United States, violated the 4th Amendment

rights of U.S. Citizens (and State Constitutional Rights to Property), and defrauded investors of which includes pension funds, insurance companies, and the GSEs, now in conservatorship since 2008.

## VIII.    **PRAYER FOR RELIEF**

129.    WHEREFORE, the United States and the Plaintiff States, and the District of Columbia, respectfully request that judgment be entered in their favor and against the Banks as follows:

130.    On Count I, judgment against the Defendants, injunctive relief to restrain the Banks from further unlawful conduct; an order requiring disgorgement of unlawful gains obtained by the Banks as a result of their unlawful conduct; restitution or other remedial relief to compensate individual victims of the Banks' unlawful conduct; civil penalties; and attorney fees and costs of investigation.

131.    On Count II, judgment against the Defendants, injunctive relief to restrain the Banks from further unlawful conduct; an order requiring disgorgement of unlawful gains obtained by the Banks as a result of their unlawful conduct; restitution or other remedial relief to compensate individual victims of the Banks' unlawful conduct; civil penalties; and attorney fees and costs of investigation.

132.    On Count III, judgment against the Defendants, for treble damages and civil penalties in an amount as the Court may determine between $5,500 and $11,000 for each violation;

133.    On Count IV, for a civil penalty of up to $1 million dollars for each violation, plus such other relief as is in connection with each false entry or assignment, or such greater amount as provided by law;

134.     On Count V, declaratory and injunctive relief, as appropriate, and an award of damages to be paid to each identifiable victim of the Defendants' violations of the SCRA;

135.     On Counts VI and VII, for appropriate declaratory relief and for compensatory damages, in an amount to be determined at trial, and for necessary post-judgment relief to prohibit the Defendants from violating 11 U.S.C. §§ 362 and 501, and from acting in violation of 11 U.S.C. § 524;

136.     On Count VIII, judgment against the Defendants, for treble damages and civil penalties in an amount as the Court may determine just and proper for each violation;

137.     Attorney fees' if applicable; and

138.     For all other and further relief as the Court may deem just proper and equitable.

Respectively Submitted

Clarence E. Owens
P.O. Box 123
Willingboro, New Jersey 08046
(T) 609-534-6703
Email: clayowenslfg@gmail.com